# ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION

CASE NO: 04-61422-CIV-COHN/SNOW

MIAMI DOLPHINS, LTD., and
NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

      Petitioners,

vs.

ERRICK L. "RICKY" WILLIAMS and
NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION,

      Respondents.

_____/

## MEMORANDUM OF LAW IN SUPPORT OF RESPONDENT'S CROSS-MOTION TO VACATE THE ARBITRATION AWARD

M11:\160149\03\3FKL03!.DOC\64922.0227

Dockets.Justia.com

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND ................................................................................... 2

ARBITRATION PROCEEDINGS ........................................................................... 6

ARGUMENT ............................................................................................................ 9

      THE ARBITRATION AWARD MUST BE  SET ASIDE BECAUSE IT
      MANIFESTLY DISREGARDS  THE APPLICABLE STATE LAW AND
      PUBLIC POLICY WHICH PROHIBIT THE ENFORCEMENT OF
      PENALTY CLAUSES IN A CONTRACT ................................................... 9

    A.     Applicable State Law Required The Arbitrator To Determine
          Whether The Stipulated Damages Provisions In Williams'
          Contracts Were Unenforceable Penalties................................................... 9

    B.     The Liquidated Damages Provisions Enforced By The Award Are
          Classic Penalty Provisions Which The Arbitrator Was Required To
          Void Under Applicable State Laws ......................................................... 12

    C.     The Arbitration Award Must Be Vacated Because It Demonstrates
          A Manifest Disregard For The Law And Public Policy Of The
          States Of Florida And Louisiana............................................................. 15

CONCLUSION....................................................................................................... 19

## TABLE OF AUTHORITIES

### Cases

Am. Leasing Co. of Monroe, Inc. v. Lannon E. Miller & Son, Gen. Contracting, Inc., 469
   So. 2d 325 (La. Ct. App. 1985)...........................................................................................11

Belknap, Inc. v. Hale, 463 U.S. 491
   (1983).................................................................................................................................14

Carney v. Boles, 643 So. 2d 339
   (La. Ct. App. 1994) ...............................................................................................9, 13, 18

Caspert v. Anderson Apartments, Inc., 94 N.Y.S.2d 521
   (N.Y. Sup. Ct. 1949)..........................................................................................................12

Caterpillar Inc. v. Williams, 482 U.S. 386
   (1987).................................................................................................................................14

Coleman v. B.R. Chamberlain & Sons, Inc., 766 So. 2d 427
   (Fla. Dist. Ct. App. 2000) .....................................................................................9, 13, 17

Daily News v. Newspaper & Mail Deliverers' Union of New York, No. 99 Civ. 5165,
   1999 WL 1095613 (S.D.N.Y. Dec. 2, 1999) ....................................................................16

Delta Air Lines, Inc. v. Air Line Pilots Ass'n, 861 F.2d 665
   (11th Cir. 1988)...........................................................................................................16, 17

Gas Aggregation Services, Inc. v. Howard Avista Energy, LLC, 319 F.3d 1060
   (8th Cir. 2003)....................................................................................................................15

Georgia Power Co. v. Int'l Bhd. of Elec. Workers, Local 84, 995 F.2d 1030
   (11th Cir. 1993)..................................................................................................................12

Hyman v. Cohen, 73 So. 2d 393
   (Fla. 1954)..........................................................................................................................11

Int'l Chemical Workers Union v. Columbian Chems. Co., 331 F.3d 491
   (5th Cir. 2003)....................................................................................................................15

Keiser, Inc. v. Catholic Diocese of Shreveport, No. 38,797-CA, 2004 WL 1837441
   (La. Ct. App. Aug. 18, 2004) .............................................................................................10

LeFemine v. Baron, 573 So. 2d 326
   (Fla. 1991)......................................................................................................................9, 10

Lightning v. Roadway Express, Inc., 60 F.3d 1551
(11th Cir. 1995)..................................................................................................14

Mobley v. Mobley, 852 So. 2d 1136
(La. Ct. App. 2003)......................................................................................9, 10, 18

Montes v. Shearson Lehman Bros., Inc., 128 F.3d 1456
(11th Cir. 1997)..................................................................................................15

Nat'l Football League Players Ass'n v. Pro-Football, 857 F. Supp. 71 (D.D.C. 1994),
vacated as moot, 56 F.3d 1525 (D.C. Cir. 1995), rev'd, 79 F.3d 1215
(D.C. Cir. 1996) .........................................................................................1, 16, 17

New York Telephone Co. v. Communications Workers of Am. Local 1100, 256 F.3d 89
(2d Cir. 2001)................................................................................................1, 15

Philippi v. Viguerie, 606 So. 2d 577
(La. Ct. App. 1992).............................................................................................17, 18

Phoenix Newspapers, Inc. v. Phoenix Mailers Union Local 752, 989 F.2d 1077
(9th Cir. 1993)...............................................................................................16, 17

Stenor, Inc. v. Lester, 58 So. 2d 673
(Fla. 1952).....................................................................................................9, 11

T.A.S. Heavy Equip., Inc. v. Delint, Inc., 532 So. 2d 23
(Fla. Dist. Ct. App. 1988) ..........................................................................................10

United Paperworkers Int'l v. Misco, Inc., 484 U.S. 29
(1987)......................................................................................................1, 15, 16

## Statutes

29 U.S.C. § 185...........................................................................................................1

LA. CIV. CODE ANN. art. 2012.........................................................................................9, 17

LA. REV. STAT. ANN. § 23:634(A)...............................................................................10, 17, 18

## Secondary Source

BLACK'S LAW DICTIONARY (7th ed. 1999) ...............................................................................12

## PRELIMINARY STATEMENT

While arbitration awards are rarely set aside, there are limited circumstances, such as those presented here, that compel such action. Specifically, when an arbitrator acknowledges applicable state law, but manifestly disregards that law, or issues an arbitration award in violation of a well-defined public policy, such an award must be set aside under Section 301 of the Labor Management Relations Act. 29 U.S.C. § 185. See also Nat'l Football League Players Ass'n v. Pro-Football, 857 F. Supp. 71, 76 (D.D.C. 1994) (NFL arbitration award set aside because it violated public policy of Virginia), vacated as moot, 56 F.3d 1525 (D.C. Cir 1995), rev'd, 79 F.3d 1215 (D.C. Cir. 1996); United Paperworkers Int'l v. Misco, Inc., 484 U.S. 29, 42-44 (1987) ("A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy."); New York Tel. Co. v. Communications Workers of Am. Local 1100, 256 F.3d 89, 91 (2d Cir. 2001) (award vacated where arbitrator knew of well defined legal policy but refused to apply it).

The arbitration award at issue applies a contractual penalty provision to require Ricky Williams, a player for the NFL's Miami Dolphins, to pay the team $8.6 million for retiring from the NFL and thereby breaching his contract with the team. This sum consists of: (i) signing bonus monies that were paid to Mr. Williams by a different team, the New Orleans Saints, before Williams ever entered into any contract with the Dolphins; and (ii) all of the incentive monies that the player had already earned and received from the Dolphins for his superior performance during the past two NFL seasons. In total, the contractual penalty for breaching the contract with the Dolphins constituted approximately 140% of the total amount that the Dolphins had paid to Williams for his services as an NFL player, and approximately 52% of all the salary, incentive and escalator payments Williams earned in his five year NFL career with the Dolphins and the New Orleans Saints.

In granting this award, the arbitrator manifested a wholesale disregard for the applicable state law of both Florida and Louisiana, which precludes the enforcement of contractual penalty clauses which bear no reasonable relationship between the breach

at issue -- here, Mr. Williams' retirement as an NFL player -- and the damages suffered by the party to the contract. Indeed, the arbitrator made no attempt to determine whether the stipulated damages amounts bore any reasonable relationship to any damages actually suffered by the Dolphins as a result of Williams' retirement and chose not to hear evidence on this issue. Instead, the arbitrator disregarded the clear requirements of both Florida and Louisiana state law -- which the NFL Collective Bargaining Agreement ("CBA")[1] made applicable to Mr. Williams' player contracts -- and issued an award in violation of the strong public policy of these states. There was no lawful basis for the arbitrator to take this action and the award should be set aside so that a new arbitration can be held in which state law is properly applied.

## FACTUAL BACKGROUND

On May 14, 1999, Ricky Williams and the New Orleans Saints signed a Player Contract for the 1999-2005 NFL seasons, with a team option for the 2006 season (a total of eight seasons). (NFL Player Contract between Ricky Williams and the New Orleans Saints, dated May 14, 1999 ("New Orleans Contract"), a true and correct copy of which is attached hereto as Exhibit "B".) The New Orleans Contract required the Saints to pay Williams a signing bonus of $8,843,593. Id. The penalty provisions relating to this bonus in the event of a breach of the contract by Williams were set forth in an addendum entitled "Additional Consideration Signing Bonus," which stated, in relevant part, as follows:

> This agreement is entered into in good faith between the NEW ORLEANS LOUISIANA SAINTS, the "Club", and RICKY WILLIAMS, the "Player";
>
> As additional consideration for the execution of NFL Player Contracts for the 1999, 2000, 2001, 2002, 2003, 2004, 2005 and 2006 (option year) NFL seasons, and for the Player's adherence to all provisions of said contracts, and for Player's commitment to participate in the Club's 1999, 2000, 2001, 2002, 2003, 2004, 2005 and 2006 (option year) off-season workout programs (ninety percent participation), and Player's commitment to maintaining an agreed body weight during certain periods of the year (see below) for the 1999, 2000, 2001, 2002, 2003, 2004, 2005

---

[1] A true and correct copy of the 2002-2008 NFL Collective Bargaining Agreement is attached hereto as Exhibit "A".

and 2006 (option year) seasons, Club agrees to pay Player the sum of $8,843,593.00.

The above sum shall be payable as follows:

$3,600,000 upon execution
$3,600,000 on May 14, 2000
$1,643,593 on November 14, 2000

It is expressly understood that no part of the bonus herein provided is part of any salary in the contracts specified above.

In the event Player, in the first year specified above, does not pass the Club physical, or in any of the years specified above, fails or refuses to practice or play, or is suspended by the NFL or Club for Conduct Detrimental or is suspended for violation of the NFL Policy and Program for Drugs of Abuse and Alcohol, or incurs a suspension under the NFL Violent Crime Policy, or is suspended for violating any of the NFL's disciplinary policies or programs, then the following shall apply: Upon Player's failure to perform for the above enumerated reasons under Player's contracts for the 1999, 2000, 2001, 2002, 2003, 2004, 2005 and 2006 (option year) seasons, Player shall forfeit all future payments and amounts not yet received, and shall immediately return and refund to the Club any of the Additional Consideration previously paid by Club in the proportionate amount of the Additional Consideration as follows: . . . K. Voluntary Breach or Failure to Perform after January 31, 2004, and before or during the 8th game of the 2004 regular season:  37.50% ($3,316,343)

Id. (emphases added).  As provided for in the CBA, App. C, NFL Player Contract, Paragraph 22, the New Orleans Contract provided that the parties should specify  a governing state law, and the provisions here expressly provided that the contract was made under and shall be governed by the laws of the State of Louisiana. See Ex. B, App. C, ¶ 22.)[2]

On March 8, 2002, the Saints traded the exclusive rights to Williams' NFL services under his Player Contract to the Miami Dolphins.  See Opinion In the Matter of the Arbitration Between Miami Dolphins and Ricky Williams, dated October 5, 2004 ("Opinion"), a true and correct copy of which is attached hereto as Exhibit "C" at 4. Williams and the Dolphins executed a new NFL Player Contract on September 7, 2002.

---

[2] The requirement for each NFL team to utilize the form of NFL Player Contract attached to the CBA is set forth in Article XIV, Section 1 of the CBA.

See NFL Player Contract between Ricky Williams and the Miami Dolphins, dated September 7, 2002 ("Dolphins Contract"), a true and correct copy of which is attached hereto as Exhibit "D". As required by the CBA, the Dolphins Contract states:

> 21.    OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

Id. The Dolphins Contract also included a choice of law provision, as required by the CBA, which stated that the contract was made under and would be governed by Florida state law. See id., ¶ 22.

The Dolphins Contract further included performance incentives that Williams could earn "on a season by season basis for performance during each respective football season." Id., Addendum 1, ¶ 2 (emphasis added); see id. ¶¶ 3-7. It also contained salary escalator provisions that were directly linked to the achievement of the performance incentives. See id., ¶ 8 ("Subject to the terms and conditions contained in Paragraph 12, Player's 2003 Paragraph 5 Salary will be modified and increased by an amount equal to 100% of the performance bonuses Player earns pursuant to the preceding paragraphs 3 through 7 during the 2002 Regular Season.") (emphasis added); id., ¶ 9 ("Subject to the terms and conditions contained in Paragraph 12, Player's 2004 Paragraph 5 Salary will be modified and increased by an amount equal to 100% of the performance bonuses Player earns pursuant to the preceding paragraphs 3 through 7 during the 2002 and 2003 Regular Seasons.") (emphasis added).

The Dolphins Contract also included the following "Default" provision:

> 12.    DEFAULT. In the event Player fails or refuses to report to Club, or fails or refuses to practice or play with Club at any time for any reason including Player's suspension by the NFL or Club for Conduct Detrimental or suspension for violating the NFL Policy and Program for Drugs of Abuse and Alcohol, or leaves Club without its consent during the duration of the above league years, or if Player is otherwise in breach of

4

this Contract, <u>then Player shall be in default ("Default").  If Player is in</u>
<u>Default, then, upon demand by Club, Player shall</u>:

        12.1.   immediately <u>return and refund to the Club any and all</u>
<u>incentives previously paid by Club pursuant to paragraphs 3 through 7 of</u>
<u>this Addendum regardless of the year in which such incentives were</u>
<u>earned or paid</u>;

        12.2.   immediately <u>return and refund to the Club any and all</u>
<u>Paragraph 5 Salary Escalators previously paid</u> by Club pursuant to
paragraphs 8 through 10 of this Addendum <u>regardless of the year in which</u>
<u>such escalators were earned or paid</u>;

        12.3.   <u>relinquish and forfeit any and all earned but unpaid</u>
<u>incentives</u> pursuant to paragraphs 3 through 7 of this Addendum
<u>regardless of the year in which such incentives were earned</u>;

        12.4.   <u>relinquish and forfeit any and all earned but unpaid</u>
<u>Paragraph 5 Salary Escalators</u> pursuant to paragraphs 8 through 10 of this
Addendum <u>regardless of the year in which such escalators were earned</u>;

        12.5.   relinquish and forfeit the right to earn any unearned
incentives pursuant to paragraphs 3 through 7 of this Addendum
regardless of the year in which such incentives are earnable; and

        12.6.   relinquish and forfeit the right to earn any unearned
Paragraph 5 Salary Escalators pursuant to paragraphs 8 through 10 of this
Addendum regardless of the year in which such escalators are earnable.

<u>Id</u>. (emphasis added).

      In addition to the above, the Dolphins Contract included a provision
stating that any prior contract was superceded by the Dolphins Contract with the
exception of Attachment 1 to the New Orleans Contract.  <u>See</u> <u>id</u>., Addendum 1, ¶ 1.  The
Dolphins Contract thus did not change the terms of the "Additional Consideration
Signing Bonus" provisions in Attachment 1 that had been entered into as part of
Williams' contract with the New Orleans Saints, which are expressly governed by
Louisiana law.

      Williams played with the Dolphins during the 2002 and 2003 NFL
seasons.  During those seasons, Williams was a top performer on the field and earned
various performance incentives and salary escalators pursuant to Addendum 1 of his
Dolphins Player Contract.  <u>See</u> Transcript of the Hearing in the Matter of the Miami

Dolphins v. Ricky Williams, dated September 21, 2004, a true and correct copy of which is attached hereto as Exhibit "E" at 60-61. However, Williams filed a formal retirement notice with the League on July 27, 2004. See Letter from Wm. David Cornwell to Rapheal M. Prevot, Esq., dated July 27, 2004, a true and correct copy of which is attached hereto as Exhibit "F".

On August 10, 2004, the Dolphins wrote a letter to Williams in which the team took the position that Williams' "election not to perform services for the Club triggers specific contractual repayment provisions and adjustments to compensation . . . [totaling] approximately $8,600,000." Letter from Bryan Wiedmeier to Errick Williams, dated August 10, 2004, a true and correct copy of which is attached hereto as Exhibit "G". On August 19, 2004, the Dolphins sent Williams another letter, entitled "Notice of Default and Demand for Repayment of $8,616,343," which stated that Williams' failure to report, practice and play for the Club and his suspension under the Drug Program constitute a "breach of the Contract" and "[u]pon a breach of the Contract, the Club has the right to demand that you immediately repay the aggregate amount of $8,616,343." Letter from Bryan Wiedmeier to Errick Williams, dated August 19, 2004 ("Notice of Default"), a true and correct copy of which is attached hereto as Exhibit "H" (emphasis added). The Notice of Default further stated that Williams' suspension for four games for allegedly using a banned substance "constitutes an independent ground for default" and that "the Club hereby requires and demands that you immediately repay the Club the sum of $8,616,343." Id.

## ARBITRATION PROCEEDINGS

On September 1, 2004, the Miami Dolphins and the NFLMC filed a non-injury grievance against Williams under Article IX of the CBA. See Letter from Dennis Curran to Richard Berthelsen, dated September 1, 2004 (the "Grievance"), a true and correct copy of which is attached hereto as Exhibit "I". The Grievance alleged that the terms of the Dolphins Contract require Williams to pay the Dolphins $8,616,343 "as a result of his recent multiple breaches." Id. at 1. The $8,616,343 that the Dolphins demanded Williams pay to the team consisted of: (i) 37.5% of the signing bonus the

Saints (not the Dolphins) paid to Williams ($3,316,343);[3] and (ii) the performance incentives and salary escalators that Williams had already earned from the Dolphins for his performance on the field during the 2002 and 2003 seasons, and which the Dolphins had already paid to Williams ($5,300,000). See id. at 3-4. The Grievance asserted: "Williams' failure to report and play under the terms of his Contract with the Dolphins constitutes a clear breach of the express terms of the Contract . . . . Williams' suspension under the NFL Policy and Program for Substances of Abuse constitutes a clear breach of his Contract." Ex. I at 3 (emphasis added).

On September 10, 2004, the NFLPA denied the grievance in its entirety. See Letter from Richard Berthelsen to David Gardi, dated September 10, 2004, a true and correct copy of which is attached hereto as Exhibit "J". On September 20, 2004, the parties submitted Pre-Hearing Briefs to Arbitrator Richard I. Bloch and, on September 21, 2004, a hearing was held before Arbitrator Bloch.[4] At the hearing, the Arbitrator heard no testimony; rather, he heard only legal argument from counsel for each party.

Specifically, counsel for the NFLMC argued that there was no need for the Arbitrator to conduct a factual hearing to determine whether the provisions of the contracts that required Williams to pay $8,616,343 constituted unenforceable penalties for contractual breach under state law because the Arbitrator was required only to evaluate the enforceability of the contract under the CBA without regard to state law. See, e.g., Ex. E at 33 ("What you do have to resolve in terms of the legal principles is what the CBA has to say about these contract provisions and . . . you don't have to resolve what Florida state law and liquidated damages in cases that clearly don't apply has to say."); see also id. at 34-35. The NFLPA disagreed. Its counsel argued that however the contract was characterized, "you still invoke the state law about what's fair in contracts and the state law policy that says you don't punish people for breach of contracts, what you do is you get fair damages from them." Id. at 110 (emphasis added).

---

[3] The fact that the Dolphins are seeking the repayment of money the Saints, not the Dolphins, paid to Williams further emphasizes that the clauses at issue make no attempt to reasonably estimate the Dolphins' actual damages in the case of breach.

[4] A true and correct copy of the Pre-Hearing Brief of the Miami Dolphins and the NFLMC, dated September 20, 2004 ("Dolphins Pre-Hearing Brief") is attached hereto as Exhibit "K". A true and correct copy of the Pre-Hearing Brief of Ricky Williams and the NFLPA, dated September 20, 2004 ("Williams Pre-Hearing Brief") is attached hereto as Exhibit "L".

The bottom line, the NFLPA argued, is that the contractual damages provisions for breach must "pass[] muster under the law of liquidated damages." Id. at 113.

The Arbitrator stated that the issue before him was a "legal contractual question rather -- in its essence rather than a fact dispute." Id. at 119. As a result, the Arbitrator failed to consider any evidence relating to the amount of the alleged harm suffered by the Dolphins because of Williams' retirement or other alleged contractual breaches. The Arbitrator stated: "What I will say on the subject of damages . . . is that if it comes to a point where, for some reason, the remedy is to set aside these provisions and have the parties have recourse to a standard damage approach, I would certainly keep the record open for that point." Id. at 124. However, because the Arbitrator did not apply state law or policy relating to liquidated damages, he never received any evidence on the relationship between the penalty claimed by the Dolphins and the damages the team claims to have incurred.

On September 24, 2004, the Arbitrator rendered an award granting the Dolphins' grievance in toto and ordering Williams to pay $8,616,343.00. See Memorandum from Richard I. Bloch to Richard Berthelsen, et al., dated September 24, 2004, a true and correct copy of which is attached hereto as Exhibit "M". On October 5, 2004, the Arbitrator issued an Opinion stating his grounds for the Award. In his Opinion, the Arbitrator acknowledged the NFLPA's argument that the money sought by the Dolphins was an unenforceable contractual penalty under Florida and Louisiana law and recognized that there is a "commonly-accepted principle that a liquidated contract provision must bear some reasonable relationship to the anticipated loss." Ex. C at 11. However, the Arbitrator went on to simply disregard that state law and policy, concluding that it did not have to be applied to the contractual provisions that the Dolphins were seeking to enforce. Id.[5]

_____

[5] While the Arbitrator did state in a conclusory manner that "the tradeoffs by the Club in gaining the Williams contract -- two first round and a fourth round draft choices" -- are substantial (see Ex. C at 11), he neither requested nor heard any evidence which would support a factual determination of whether the stipulated damages amounts for breach or default were a reasonable estimate of the damages actually suffered by the Dolphins or unenforceable penalties.

## ARGUMENT

### THE ARBITRATION AWARD MUST BE
### SET ASIDE BECAUSE IT MANIFESTLY DISREGARDS
### THE APPLICABLE STATE LAW AND PUBLIC POLICY WHICH
### PROHIBIT THE ENFORCEMENT OF PENALTY CLAUSES IN A CONTRACT

**A.    Applicable State Law Required The Arbitrator To Determine Whether The Stipulated Damages Provisions In Williams' Contracts Were Unenforceable Penalties**

Under both Florida and Louisiana state law, it is well-settled that parties may not enforce a liquidated damages provision that is disproportionate to a reasonable approximation of the actual damages to be incurred, and is instead designed as a private penalty to compel performance under the contract. See, e.g., Coleman v. B.R. Chamberlain & Sons, Inc., 766 So. 2d 427, 429-30 (Fla. 5th DCA 2000) ("Florida courts will not enforce a penalty which is 'disproportionate to the damages' and 'is agreed upon in order to enforce performance' of a contract and 'held *in terrorem* over the promisor to deter him from breaking his promise.'") (citations omitted); Mobley v. Mobley, 852 So. 2d 1136, 1139 (La. Ct. App. 2003) ("[S]tipulated damages should reasonably approximate the damages suffered by the obligee and not be penal."); see also LA. CIV. CODE ANN. art. 2012 (stipulated damages clauses may not be enforced when "they are so manifestly unreasonable as to be contrary to public policy").

In assessing whether a liquidated damages clause for breach or default is a penalty, there must be factual findings based on <u>evidence</u> that the parties actually attempted to approximate the actual damages caused by the breach. See, e.g., Carney v. Boles, 643 So. 2d 339, 343 (La. Ct. App. 1994) ("The court must determine the reasonableness of the amount of stipulated damages <u>by inquiring whether the parties attempted to approximate actual damages in confecting the stipulated damages provision of the agreement</u>.") (emphasis added); Stenor, Inc. v. Lester, 58 So. 2d 673, 675 (Fla. 1952) (critical factor for determining enforceability is whether the specified sum is reasonable compensation for damage caused by the breach). Indeed, both jurisdictions specifically require courts or arbitrators to perform a factual analysis of whether the liquidated damage amounts were a reasonable approximation of the actual damages incurred as result of the breach. See, e.g., Lefemine v. Baron, 573 So. 2d 326, 328 (Fla.

9

1991) (determination must be made that liquidated damages clause is designed to approximate a reasonable estimate of the actual amount of the damages incurred rather than designed to induce performance through a penalty); Mobley, 852 So. 2d at 1139 (an inquiry must be made into the "reasonableness of the amount of stipulated damages by inquiring whether the parties attempted to approximate actual damages").

For example, in Mobley, a Louisiana appellate court reversed a trial court's enforcement of a stipulated damages provision where the trial court had failed to hear evidence regarding the enforceability of the provision or to reduce the amount to the plaintiff's "actual damages." 852 So. 2d at 1138. The Louisiana court of appeals remanded and ordered the trial court to make a reasonable approximation of the actual damages (see id. at 1141) because "stipulated damages" clauses were not to be used as "a vehicle for recovery of punitive damages, as opposed to compensatory damages." Id. at 1139.

Both Florida and Louisiana law also specifically preclude enforcement of contract provisions, like those at issue here, designed to deprive a party of money that has already been earned. See, e.g., T.A.S. Heavy Equip., Inc. v. Delint, Inc., 532 So. 2d 23, 25 (Fla. 4th DCA 1988) (agreement that contractor would only be paid for 75% of the work he already performed in the case of a breach was an unenforceable penalty; "the language of the termination clause reflects the intent of the parties that a penalty be imposed upon T.A.S. in the event of its breach by not being paid for the full amount of the work actually performed") (emphasis added); LA. REV. STAT. ANN. § 23:634(A) ("No person . . . shall require any of his employees to . . . forfeit their wages if discharged before the contract is completed or if the employees resign their employment before the contract is completed; but in all such cases the employees shall be entitled to the wages actually earned up to the time of their discharge or resignation.") (emphases added); Keiser, Inc. v. Catholic Diocese of Shreveport, No. 38,797-CA, 2004 WL 1837441, at *4, *6 (La. Ct. App. Aug. 18, 2004) (stipulated damages clause in teacher's employment contract void because teacher entitled to wages already earned).

In this case, the fact that the "default" provisions in the contracts fail to account for any varying degrees of breach in setting the amount of damages to be paid by Williams (for example, the same penalty applies under the Dolphins Contract regardless

of how many games Mr. Williams refuses to play) further demonstrates that the provisions are pure penalties. "[W]here an agreement is to pay the same sum for a partial as for a total breach or is to secure the performance of covenants of widely varying importance for any of which the sum is excessive, it will be regarded as a penalty." Stenor, 58 So. 2d at 675; see also Hyman v. Cohen, 73 So. 2d 393, 399 (Fla. 1954) ("[I]f the payment . . . is incurred upon the breach of any of several different covenants of widely varying importance, for any of which the sum is excessive, [the parties could only have intended to induce performance of the covenant and not to liquidate in advance their damages for such a breach]."); Am. Leasing Co. of Monroe, Inc. v. Lannon E. Miller & Son, Gen. Contracting, Inc., 469 So. 2d 325, 328-29 (La. Ct. App. 1985) (clause in lease requiring full payment of the balance of rent for the whole lease term regardless of when during the term the lease was broken did not approximate damages and was contrary to public policy).

Arbitrator Bloch was indisputably made aware of this Florida and Louisiana law prohibiting the enforcement of contractual penalties. Not only did Williams and the NFLPA explicitly recite the applicable law in their Pre-Hearing Brief (see Ex. I. at 2-3, 15-28) their counsel reiterated and expounded upon these rules of law at the Hearing. See, e.g., Ex E at 64, 81, 82, 86, 110.

However, the Dolphins and NFLMC affirmatively argued to Arbitrator Bloch, both in written submission and at oral argument, that he should disregard the applicable state law. See, e.g., Ex K at 2-3, 14, 18; Ex. E at 12-13, 33, 48, 102. For example, at the Hearing, counsel for the Dolphins and the NFLMC argued: "What you do have to resolve in terms of the legal principles is what the CBA has to say about these contract provisions and . . . you don't have to resolve what Florida state law and liquidated damages in cases that clearly don't apply has to say." Ex. E at 33.

The Award issued by Arbitrator Bloch demonstrates that he accepted the arguments of the NFL and chose to disregard applicable state law. In his Opinion, he made express note of the cited Louisiana and Florida cases prohibiting penalty provisions and requiring damages to be reasonably related to actual loss: "The various state law cases do reflect the commonly-accepted principle that a liquidated contract provision must bear some reasonable relationship to the anticipated loss." Ex. C at 10-11.

11

However, he chose not to hear any evidence to make this factual determination. Ex. E at 124, 127, 129. The Arbitrator never received any such evidence and refused to apply the clearly applicable state law against penalty clauses and issued his Award without ever making the required liquidated damages determination.

### B.   The Liquidated Damages Provisions Enforced By The Award Are Classic Penalty Provisions Which The Arbitrator Was Required To Void Under Applicable State Laws

The Arbitrator did not conduct the factual inquiry required by applicable state law on the ground that the contractual provisions at issue did not have to be evaluated as liquidated damages or penalty clauses. Instead, the Arbitrator simply re-characterized the liquidated damages clauses of the contracts as "conditions" for payment that specified the circumstances under which money would be taken away from Mr. Williams. See Ex. C at 11. But, calling these liquidated damages provisions by another name does not immunize them from the state law and strong public policy against unenforceable penalties for breach. See Georgia Power Co. v. Int'l Bhd. of Elec. Workers, Local 84, 995 F.2d 1030, 1032 (11th Cir. 1993) (arbitrator's denomination of an award as compensatory does not prevent the court from determining that the award is in fact punitive); Caspert v. Anderson Apartments, Inc., 94 N.Y.S.2d 521, 558 (N.Y. Sup. Ct. 1949) ("Likewise, equity will prevent the enforcement of a forfeiture for nonperformance of conditions subsequent and refuse to give effect to a covenant for liquidated damages if it would be equivalent in substance to a penalty.").[6]

Black's Law Dictionary defines "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." BLACK'S LAW DICTIONARY 393 (7th ed. 1999). Liquidated Damages are defined as "an amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches." Id. at 395.

---

[6] In Georgia Power, the Eleventh Circuit considered the fact that arbitrators had made no factual findings regarding the actual damages incurred in concluding that, even though the arbitrators had termed their award as compensatory, the damages awarded were in fact punitive. 995 F.2d at 1032.

The contractual provisions that were the subject of the Award set forth how much money Williams had to pay the Dolphins for specified contractual "defaults"; they are thus unequivocally liquidated damages provisions which require a factual evaluation under applicable state laws to determine whether they were reasonable estimates of the actual damages or unenforceable penalties. Indeed, the Dolphins' Grievance is based on the claim that "Williams' failure to report and play under the terms of his Contract with the Dolphins constitutes a <u>clear breach of the express terms of the Contract</u>." Ex. I at 3 (emphasis added); <u>see also</u> Ex. H. Similarly, the Dolphins claimed in the arbitration that "Williams' suspension under the [NFL's Drug Program] constitutes a clear breach of his Contract."[7] Ex. I at 3. And, the Dolphins asserted that "<u>as a result of [his] multiple contract breaches</u>," he must pay the Dolphins $8,616,343. <u>Id.</u> (emphasis added). These are exactly the type of liquidated damages clauses that can not be enforced under the law and public policy of Florida and Louisiana if they constitute a penalty and are designed, as they were here, to deter contractual non-performance. <u>See, e.g.</u>, <u>Coleman</u>, 766 So. 2d at 429-30 (penalty agreed upon to enforce performance of contract unenforceable) (citations omitted); <u>Carney</u>, 643 So. 2d at 343 (stipulated damages may not be penal).

Further, the very language of the contractual provisions at issue make it clear that they are liquidated damages provisions that are triggered by a contractual "breach" or "default." For example, the Additional Consideration Signing Bonus states:

> Upon Player's <u>failure to perform</u> for the above enumerated reasons under Player's contracts for the 1999, 2000, 2001, 2002, 2003, 2004, 2005 and 2006 (option year) seasons, <u>Player shall forfeit all future payments and amounts not yet received, and shall immediately return and refund to the Club any of the Additional Consideration previously paid by Club in the proportionate amount of the Additional Consideration as follows:</u> . . . <u>K. Voluntary Breach or Failure to Perform</u> after January 31, 2004, and before or during the 8[th] game of the 2004 regular season: 37.50% ($3,316,343).

---

[7] The very fact the Dolphins are relying in part on Williams' alleged violation of the NFL drug policy as a breach of his contract is further evidence that these are in fact penalty clauses. Since the CBA gives <u>exclusive</u> jurisdiction to the NFL Commissioner to impose discipline for violations of the drug policy, the additional punitive measure of using the "default" provisions to increase the penalty imposed by the Commissioner demonstrates that the Dolphins are seeking a penalty from Williams rather than compensation for their claimed damages.

Ex. B (emphasis added). Similarly, the "Default" provision of the Dolphins Contract reads as follows:

> **DEFAULT.** In the event Player fails or refuses to report to Club, or fails or refuses to practice or play with Club at any time for any reason including Player's suspension by the NFL or Club for Conduct Detrimental or suspension for violating the NFL Policy and Program for Drugs of Abuse and Alcohol, or leaves Club without its consent during the duration of the above league years, or if Player is otherwise in breach of this Contract, then Player shall be in default ("Default").

Ex. D, Addendum 1, ¶ 12. It would severely undermine and violate public policy against the enforcement of contractual penalties if one could avoid the state law of Florida and Louisiana by simply re-labeling clear liquidated damages clauses as payment "conditions."

The Dolphins and the NFLMC argued, and the Arbitrator apparently agreed, that state liquidated damages law is not applicable because the CBA in the NFL controls. See Ex. E at 12, 34-36; Ex. K at 14; Ex. C at 11. However, it is well-settled that state law is only pre-empted by federal labor law when there is a conflict with the collective bargaining process or the terms of a collective bargaining agreement.[8] See Caterpillar Inc. v. Williams, 482 U.S. 386, 394-97 (1987) (employees' suit under individual employment contracts asserting state rights and not requiring interpretation of the collective bargaining agreement not governed by federal law); Belknap, Inc. v. Hale, 463 U.S. 491 (1983) (strike replacement workers may bring state breach of contract case against employer for firing workers to make room for returning strikers); Lightning v. Roadway Express, Inc., 60 F.3d 1551 (11th Cir. 1995) (state law not pre-empted by federal labor law because resolution does not conflict with provisions of the collective bargaining agreement).

Here, there is no conflict between any section of the CBA and state law applicable to the enforcement of liquidated damages clauses in contracts. To the contrary, both the New Orleans Contract and the Dolphins Contract, like every other Player Contract in the NFL, contain choice of law provisions selecting the state law to

---

[8] For example, state law may be pre-empted if an arbitrator has interpreted a provision of the CBA, issued an opinion that had never been challenged and the state law at issue conflicts with the arbitrator's decision.

apply. See Ex. B, ¶ 22; Ex. D, ¶ 22. This is no accident since the Standard NFL Player Contract, which is Appendix C to the CBA and mandated for all NFL Player Contracts (see Ex. A, Art. XIV, Sec. 1) explicitly provides for such a state law selection. See Ex. A, Appendix C, ¶ 22. It thus could not be clearer that there is no conflict between the CBA and the state law of liquidated damages, and that there is no justification for the Arbitrator's refusal to apply such state law to the contractual provisions at issue.

### C.     The Arbitration Award Must Be Vacated Because It Demonstrates A Manifest Disregard For The Law And Public Policy Of The States Of Florida And Louisiana

An arbitrator's "clear disregard for the law" requires that an arbitration award be set aside. See, e.g., Montes v. Shearson Lehman Bros., Inc., 128 F.3d 1456, 1460 (11th Cir. 1997) (citing Wilko v. Swan, 346 U.S. 427, 436-37 (1953), overruled on other grounds, Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477 (1989)).[9] This is particularly true where, as here, there is evidence in the record that the arbitrator knew the applicable law and disregarded it for reasons that cannot withstand analysis. Id. at 1461 (citing O.R. Sec., Inc. v. Prof'l Planning Assocs., Inc., 857 F.2d 742, 747 (11th Cir. 1988)); see also Gas Aggregation Servs., Inc. v. Howard Avista Energy, LLC, 319 F.3d 1060, 1068-69 (8th Cir. 2003) (vacating award where arbitrator did not apply recognized law); New York Tel. Co., 256 F.3d at 93 (arbitrator manifestly disregarded law by citing and then ignoring controlling law).

In Montes, counsel for one of the parties -- like counsel for the NFLMC and the Dolphins here -- urged the arbitrators to disregard the governing law. 128 F.2d at 1458. The Eleventh Circuit reversed the district court's confirmation of the arbitration award because it was evident that there was no basis for the arbitrator's failure to apply the applicable law. Id. at 1461-62.

An arbitrator's failure to make any factual findings whatsoever with respect to a controlling issue under the applicable law demonstrates a manifest disregard

---

[9] The United States Supreme Court has specifically instructed federal courts to look to the Federal Arbitration Act ("FAA") for guidance in reviewing labor arbitration awards, Misco, Inc., 484 U.S. at 41 n.9, and courts often rely on cases decided under the FAA when evaluating such awards. See, e.g., New York Tel. Co., 256 F.3d at 91 (citing Halligan v. Piper Jaffray, Inc., 148 F.3d 197, 202 (2d Cir. 1998)); Int'l Chem. Workers Union v. Columbian Chems. Co., 331 F.3d 491, 494 (5th Cir. 2003).

for that law.  See Daily News v. Newspaper & Mail Deliverers' Union of New York, No. 99 Civ. 5165, 1999 WL 1095613, at *7-*8 (S.D.N.Y. Dec. 2, 1999).  In Daily News, the court held that such a failure by the arbitrator to make required factual findings constituted grounds for vacatur.  Id.

Here, the applicable laws are those of the states of Florida and Louisiana, both of which require the factual evaluation of liquidated damages clauses to ensure that they are reasonable and proportionate to the actual damages incurred.  The choice of law clauses in the Dolphins Contract and the New Orleans Contract make it clear that these state laws apply.[10]  However, like in Montes, while Arbitrator Bloch was aware of the relevant state law, he too was erroneously urged by the Dolphins to disregard it. Moreover, like the arbitrator in Daily News, Arbitrator Bloch heard no evidence regarding the actual damages incurred by the Dolphins and failed to make necessary factual findings on this issue -- further demonstrating that this Award must be set aside so that state liquidated damages law can be properly applied.

Indeed, the Arbitrator's failure to apply applicable state law must be set aside because it clearly violates the public policy of both Florida and Louisiana against enforcing penalty clauses.  See, e.g., Delta Air Lines, Inc. v. Air Line Pilots Ass'n, 861 F.2d 665, 670 (11th Cir. 1988) (citing Misco, Inc., 484 U.S. at 42).  "A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy."  Misco, Inc., 484 U.S. at 42 (emphasis added); see also Pro-Football, 857 F. Supp. at 76 (vacating labor arbitration award that ordered NFL team to take action under the CBA which would violate state public policy); Delta Air Lines, Inc., 861 F.2d at 672 (examining relevant state law to determine whether public policy had been violated); Phoenix Newspapers, Inc. v. Phoenix Mailers Union Local 752, 989 F.2d 1077,

---

[10] Accepting the Arbitrator's conclusion that the Dolphins stepped into the shoes of the Saints, the enforceability of Mr. Williams' obligation to pay his signing bonus to the team for a breach must be examined under Louisiana law.  If the Saints had no legal right to receive the signing bonus amount from Williams as damages under his Louisiana Contract, the Dolphins also have no such right.

1083-84 (9th Cir. 1993) (labor arbitration award that violated public policy is not enforceable).

Specifically, in <u>National Football League Players Association v. Pro-Football</u>, the NFLPA filed a grievance after the Washington Redskins football team refused to comply with a section of the CBA requiring teams to suspend players who failed to pay union dues or an equivalent service fee pursuant to an agency shop clause in the CBA. 857 F. Supp. at 73. The NFLPA argued that the laws of the District of Columbia, which permitted enforcement of such clauses, applied because the Redskins played in the District of Columbia. The arbitrator concluded that DC law applied and ordered the Redskins to suspend the players. <u>Id</u>. at 73. The Redskins refused to suspend the players and sought judicial relief, arguing that Virginia law applied and Virginia's right to work law did not permit enforcement of such agency shop provisions. <u>Id</u>. at 76 (citing VA. CODE ANN. § 40.1-58). The District Court agreed with the Redskins that Virginia law applied and refused to enforce the labor arbitrator's award because "the <u>arbitrator's decision violated the law and public policy of Virginia and therefore cannot stand</u>." <u>Id</u>. at 80 (emphasis added).

Similarly, the enforcement of the liquidated damages provisions at issue in this arbitration violates the public policy of both Louisiana and Florida against contractual penalties. <u>See</u>, <u>e.g.</u>, <u>Philippi v. Viguerie</u>, 606 So. 2d 577, 579 (La. Ct. App. 1992) (stipulated damages clause not enforced on public policy grounds); <u>Coleman</u>, 766 So. 2d at 429-30 ("Florida courts will not enforce a penalty which is 'disproportionate to the damages' and 'is agreed upon in order to enforce performance' of a contract and 'held <i>in terrorem</i> over the promisor to deter him from breaking his promise.'") (citations omitted). The violation of state public policy is especially manifest in the portion of the Award ordering Williams to pay monies he previously earned as a signing bonus from the Saints, because the Louisiana Civil Code specifically states that the enforcement of such a penalty violates its public policy. <u>See</u>, <u>e.g.</u>, LA. CIV. CODE ANN. art. 2012 (contractual damages clause may not enforced if contrary to public policy); LA. REV. STAT. ANN. § 23:634(A) ("No person . . . shall require any of his employees to . . . forfeit their wages if discharged before the contract is completed or if the employees resign their employment before the contract is completed; but in all such cases the employees shall be entitled to

17

the wages actually earned up to the time of their discharge or resignation."); <u>Mobley</u>, 852
So. 2d at 1139 (damages clause must be modified when "<u>so manifestly unreasonable as to
be contrary to public policy</u>") (emphasis added); <u>Carney</u>, 643 So. 2d at 343-44 (reducing
liquidated damages amount ($125,000) to amount approximating actual damages
($21,000) because <u>enforcement of "full amount . . . would be so manifestly unreasonable
as to be contrary to public policy</u>") (emphasis added); <u>Philippi</u>, 606 So. 2d at 579
(affirming reduction of damages by trial court to one-fifth of stipulated damages amount
on public policy grounds).

   In sum, the Arbitration Award at issue must be set aside both because it
was issued in manifest disregard of applicable state law prohibiting the enforcement of
liquidated damages clauses that bear no reasonable relation to the amount of damages
incurred by a breach and because it violates clear state public policy. Since the Arbitrator
refused to apply the applicable state laws and never heard any evidence on the
proportionality of the liquidated damages to the claimed injury suffered by the Dolphins
as a result of Williams' breach, the appropriate remedy is to vacate the Award and
remand for further proceedings before the Arbitrator so that state law can be properly
applied.

## CONCLUSION

For all of the foregoing reasons, Ricky Williams and the NFLPA respectfully request that the Arbitration Award be vacated. This is one of the rare cases where a labor arbitrator has issued an award that manifestly disregards and violates applicable state law and policy.

Dated: December 17, 2004

Respectfully submitted,

*Edward Soto*

Edward Soto (FBN 265144)
WEIL, GOTSHAL& MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159
Email: Edward.soto@weil.com

Jeffrey L. Kessler, Esq.
David G. Feher, Esq.
Melanie R. Moss, Esq.
DEWEY BALLANTINE LLP
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000

Richard A. Berthelsen, Esq.
General Counsel
National Football League Players Association
2021 L Street, N.W.
Washington, D.C. 20036
(202) 463-2000

Counsel for Williams and
National Football League Players Association

19

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of Memorandum of Law in Support of

Respondent's Cross-Motion to Vacate the Arbitration Award was served via U.S. Mail on

this _17th_ day of December, 2004 to the individuals listed below.

Stanley H. Wakshlag, Esq.                    Daniel L. Nash, Esq.
Christopher S. Carver, Esq.                   AKIN GUMP STRAUSS HAUER &
AKERMAN SENTERFITT                       FELD LLP
One Southeast Third Avenue, 28th Floor     Robert S. Strauss Building
Miami, Florida 33131                              1333 New Hampshire Avenue, N.W.
                                                         Washington, D.C. 20036-1564


By:_____
         Edward Soto

# UNITED STATE DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## ATTACHMENT TO DOCKET ENTRY: _____14_____

# NOT SCANNED

☐ VOLUMINOUS (exceeds 999 pages = 4 inches)

☐ BOUND EXTRADITION PAPERS

☐ ADMINISTRATIVE RECORD (Social Security)

☐ STATE COURT RECORD (HABEAS CASES)

☐ SOUTHERN DISTRICT TRANSCRIPTS

☐ LEGAL SIZE

☐ DOUBLE SIDED

☒ PHOTOGRAPHS

☒ POOR QUALITY (i.e. hand written, legal size, light print, etc.)

# PLEASE REFER TO COURT FILE