UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION

CASE No: 04-61422-CIV-COHN/SNOW

MIAMI DOLPHINS, LTD., and
NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

    Petitioners,

vs.

ERRICK L. "RICKY" WILLIAMS and
NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION,

    Respondents.
_____/

**MOTION OF PETITIONERS MIAMI DOLPHINS AND NATIONAL FOOTBALL
LEAGUE MANAGEMENT COUNCIL FOR CONFIRMATION OF ARBITRATION
AWARD, AND SUPPORTING MEMORANDUM OF LAW**

    Pursuant to 9 U.S.C. § 9, petitioners Miami Dolphins, Ltd. (the "Dolphins"), and the National Football League Management Council (the "Management Council") move for an order confirming the September 24, 2004, Award (the "Award") of arbitrator Richard I. Bloch in favor of the Dolphins and the Management Council and against respondents Errick T. ("Ricky") Williams and the National Football League Players Association (the "NFLPA").

    The Dolphins and the Management Council respectfully request that their motion be granted. The undisputed material facts are that the Award was rendered pursuant to a collectively bargained grievance procedure, that the arbitrator decided the factual and legal issues presented to him, and that the arbitrator interpreted the collective bargaining agreement in making the Award. Fundamental principles of labor law and arbitration compel enforcement of the Award, and require that courts apply a deferential standard of review to arbitration awards. Because the arbitration award in this case stems directly from the express terms of the contract between the

Dolphins and Williams and was issued within the scope of the arbitrator's authority, the Award is entitled to substantial deference and should be confirmed.

In support of this motion, the Dolphins and the Management Council state as follows:

**MEMORANDUM OF LAW**

## I.  INTRODUCTION

In July 2004, on the eve of the Dolphins' pre-season training camp, Williams, the Dolphins' star running back, abruptly announced his "retirement" from professional football. Only two years earlier, the Dolphins had traded three draft picks to the New Orleans Saints for Williams, whom the Saints had drafted in the first round of the 1999 National Football League ("NFL") Draft. Williams was a significant part of the Dolphins' long-term plans, which were severely damaged when he abandoned the team shortly before the 2004 season.

This case does not challenge Williams' decision to walk away from the rigors of being a NFL running back. It does concern Williams' attempt to take the benefits of his long-term contract with the Dolphins while ignoring the obligations to which he freely and explicitly agreed. Williams did not just abandon his team; he also refused to return any of the bonus and incentive money that he had been paid as part of his structured, long-term contract with the Dolphins (the "Contract"). The Contract expressly stated that Williams' entitlement to retain the bonus and incentive payments was conditioned on his promise to fulfill the entire length of the Contract, and that his failure to do so would obligate him to repay a proportionate share of a multi-million dollar signing bonus and refund all incentive bonuses and salary escalators "regardless of the year in which they were earned or paid."

In an Award dated September 24, 2004, the reasoning for which is set out in an Opinion dated October 5, 2004 (the "Opinion"), respected arbitrator Richard Bloch held that Williams' "retirement" violated these express and unambiguous provisions.[1] Arbitrator Bloch ruled that

---

[1] The Award is attached as Exhibit B to the Petition to Confirm Arbitration Award (the "Petition") [D.E. 1]; the Opinion is Exhibit C to the Petition. For ease of reference, the Award and Opinion are attached hereto at Tab **A** and Tab **B**, respectively.

Williams' retirement triggered the repayment obligations and ordered Williams to repay the Dolphins $8,616,353.00. Because Williams has not complied with the Award, the Dolphins and Management Council commenced this proceeding seeking confirmation of the Award.

Under settled law, when an arbitrator arguably construes an agreement and acts within the scope of his power as an arbitrator, a court must defer to the arbitrator's conclusions, even if the court disagrees with them and, indeed, even if they are mistaken interpretations of the law or contract. Because Arbitrator Bloch construed the Contract in reaching his decision and was empowered under the collective bargaining agreement (the "CBA") between the Management Council and the NFLPA to resolve any dispute involving "interpretation of" or "application of" a player contract, this highly deferential standard of review applies. Under this standard, the Court should confirm the Award.

Based on the Answer of National Football League Players Association and Errick L. Williams to Petition to Confirm Arbitration Award (the "Answer") [D.E. 8], Williams argues that the Contract's repayment provisions are unenforceable because Arbitrator Bloch manifestly disregarded the law, violated public policy, and acted arbitrarily and capriciously. These arguments are meritless. Arbitrator Bloch did not manifestly disregard the law, because he expressly considered the cases cited by Williams before concluding that the law did not prevent enforcement of the Contract. Similarly, public policy does not prevent enforcement of the Contract, particularly when the Award enforces express contractual terms to which Williams agreed. Finally, the Award is well-reasoned and founded on the express terms of the Contract, so it is not arbitrary and capricious. In fact, all of Williams' defenses here are nothing more than a rehash of the very same arguments made by Williams in the arbitration, which Arbitrator Bloch carefully considered and expressly rejected.

Accordingly, the Court should enter an order confirming the Award.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Williams' Contract With The New Orleans Saints.

Williams was a first-round draft pick of the New Orleans Saints in 1999. Opinion at 3. In May 1999, Williams signed a contract with the Saints (the "Saints Contract") for the 1999 through 2006 NFL seasons.[2]  *Id.*  The Saints Contract included an addendum titled "Additional Consideration Signing Bonus" (the "Additional Consideration Provision"), under which Williams was paid a signing bonus in the amount of $8,843,593.00 in consideration for his promise to, among other things, complete the full term of the agreement. *See* Tab D, Williams Ex. A.  It states, in relevant part:

> As additional consideration for the execution of the NFL Player Contracts for the 1999, 2000, 2001, 2002, 2003, 2004, 2005 and 2006 (option year) NFL seasons, and for the Player's adherence to all provisions of said contracts, and for Player's commitment to participate in the Club's 1999, 2000, 2001, 2002, 2003, 2004, 2005 and 2006 (option year) off-season workout programs (ninety percent participation) . . . Club agrees to pay Player the sum of $8,843,593.00.

*Id.* at 1 (original emphasis).

The Additional Consideration Provision details the consequences of Williams' failure to perform. If Williams "fails or refuses to practice or play" (among other grounds for default) under the contractual terms during the 1999 through 2006 seasons, "[he] shall forfeit all future payments and amounts not yet received, and shall immediately return and refund to the Club any of the Additional Consideration by Club" in a "proportionate amount" set forth under a series of schedules in the Additional Consideration Provision. *Id.*  Subsection K states that, in the event of a voluntary breach or failure to perform "after January 31, 2004, and before or during the 8th

---

[2] The documents cited herein were filed in the arbitration as part of the pre-hearing briefing. A copy of the Pre-Hearing Brief of the Miami Dolphins and the NFL Management Council ("Dolphins Pre-Hearing Brief") is attached at Tab C; a copy of the Pre-Hearing Brief of Ricky Williams and National Football League Players Association ("Williams Pre-Hearing Brief") is attached at Tab D. Exhibits to the Dolphins Pre-Hearing Brief were denominated either "Club Exhibits" or "Joint Exhibits," with numerical designations; those documents will be referenced as "Dolphins Club Ex. [#]" or "Dolphins Jt.Ex. [#]." Williams used alphabetic exhibit designations; those exhibits will be designated "Williams Ex. [letter]." As the Saints Contract is attached as Exhibit A to Williams Pre-Hearing Brief, it will be cited as "Tab D, Williams Ex. A."

game of the 2004 regular season," the proproptionate amount Williams would have to repay would be 37.50%, or $3,316,343. *Id.*

### B. Williams Is Traded To The Dolphins And Negotiates A New Contract That Has New Default Provisions And Expressly Incorporates The Additional Consideration Provision.

On March 8, 2002, the Saints traded Williams to the Miami Dolphins in exchange for three future draft picks – two first round picks and a fourth round pick. Opinion at 4, 11. Under the terms of the trade, the Saints Contract was assigned to the Dolphins. Tab C, Club Ex. 1 ("Official Agreement for Outright or Conditional Assignment (Trade Agreement)"). After the trade, Williams demanded a renegotiation of his contract. Although the Dolphins were under no obligation to do so, the team agreed to renegotiate. Opinion at 4-5. This resulted in the current Contract, which covers the same time period, but provides the opportunity for Williams to earn significantly higher compensation than the original Saints Contract. *Id.* at 4-5, n.1. Significantly, in agreeing to renegotiate, the Dolphins received nothing in return except for Williams' agreement that his right to retain certain incentive compensation payable under the Contract, as well as a portion of his previously-paid signing bonus, would be expressly conditional.

Like the Saints Contract, the Contract consists of the form NFL Player Contract and a detailed "Addendum 1 to NFL Player Contract." *See* Tab C, Dolphins Jt.Ex. 4. Although the Contract supersedes the Saints Contract, Addendum 1 expressly incorporates the Additional Consideration Provision. *Id.*, Addendum 1 (stating that "the document entitled 'Additional Consideration Signing Bonus' dated May 14, 1999 . . . is incorporated herein [and] shall remain in full force and effect"). Thus, the Additional Consideration Provision from the Saints Contract remains in effect.

In addition, the Contract provides for Williams to receive a series of performance bonuses. *Id.*, Addendum 1 at ¶¶ 3-6, 8. Of these, the Dolphins conditionally paid Williams bonuses of $5,300,000.00 for the 2002 and 2003 seasons. Opinion at 8-9, n.16.

Paragraph 12 of Addendum 1 to the Contract defines a "Default" and the consequences of a "Default." *Id.*, Addendum 1 at 5. A "Default" includes if Williams "fails or refuses to report to

Club, or fails or refuses to practice with Club at any time for any reason . . . or leaves Club without its consent during the duration of the above league years [2002-2006]." *Id.* If Williams defaults under the Contract, he must "immediately return and refund" to the Dolphins "any and all incentives" under paragraphs 3 though 7 of the Addendum and any "salary escalators" under paragraphs 8 though 10 of the Addendum previously paid by the Dolphins "regardless of the year in which [they] were earned or paid." *Id.* at ¶¶ 12.1-12.2. The Contract also provides that Williams would "relinquish and forfeit" any "earned but unpaid" and any "right to earn any unearned" incentives and salary escalators. *Id.* at ¶¶ 12.3-12.6.

### C. Williams Abruptly Retires On The Eve Of The 2004 Pre-Season.

After playing two years for the Dolphins and accepting advance payments under the Contract, Williams abandoned the team, with three years remaining under the Contract. Although he was required to report to training camp on July 30, 2004, he did not appear. Opinion at 1. Instead, Williams announced publicly that he had decided to "retire" from professional football and later had his representative inform the Management Council of that decision. Opinion at 8-9; Tab C, Dolphins Club Ex. 2. In a letter dated August 19, 2004, the Dolphins demanded that Williams repay the $8,616,343 due under the Contract. Tab A, Club Ex. 3. Williams has not played football for the Dolphins since the date of his retirement, and he has refused to return any of the $8,616,343 due to the Dolphins. Opinion at 1-2.

### D. The Dolphins And The Management Council Prevail In Their Grievance Against Williams.

When Williams refused to repay any of the money, the Dolphins, through the Management Council, filed a grievance under the CBA. Tab C, Dolphins Jt.Ex. 2. The grievance resulted in the Award requiring Williams to repay the full amount the Dolphins sought in its August 19, 2004 demand letter.

#### 1. The CBA Grievance And Arbitration Provisions

The CBA states that it is the product of "bona fide, arm's-length collective bargaining" under the National Labor Relations Act. *Id.*, Preamble. The CBA was negotiated by the

Management Council, on behalf of the various NFL football teams, and the NFLPA, which represents the NFL players. *Id.* at ¶ 8.

Under Article IX of the CBA, save for certain exceptions not applicable here, "[a]ny dispute . . . involving the interpretation of, application of, or compliance with any provision of" the CBA or the NFL Player Contract[3] is to be resolved "exclusively" by the procedure set forth in the CBA. *Id.*, Art. IX, § 1. Similarly, paragraph 19 of the Contract states that any such dispute shall be "submitted to final and binding arbitration" under the terms and conditions set forth in the CBA. Tab C, Dolphins Jt.Ex. 4 at ¶ 19.

These terms and conditions provide that any player, team, the Management Council, or the NFLPA may initiate a grievance through written notice to the opposing parties. CBA, Art. IX, §§ 2, 3. The party to whom a grievance is presented must file a written answer within seven days. *Id.*, Art. IX, § 3. If the grievance is not resolved, either party may appeal and the dispute is submitted to a mutually selected arbitrator for hearing and decision. *Id.*, Art. IX, §§ 4, 6. The parties are obligated to exchange relevant evidence in advance of the hearing, and are permitted to file pre-hearing briefs, present evidence by testimony or otherwise, and request post-hearing briefs. *Id.*, Art. IX, §§ 4, 5, 7. The parties also are entitled to be represented by counsel. *Id.*, Art. IX, § 10. The CBA provides that the Arbitration Award will be the "<u>full, final, and complete disposition of the grievance</u>, and <u>will be binding</u> upon the Player(s) and Club(s) involved and the parties to the Agreement; . . . ." *Id.*, Art. IX, § 8 (emphasis added). The CBA further provides that "[i]f an award is made by an arbitrator, payment will be made within thirty (30) days of the receipt of the award." *Id.*, Art. IX, § 12.

  2. Petitioners' Grievance Was Submitted And Determined Pursuant To The CBA.

The Dolphins and the Management Council complied with the grievance and arbitration provisions. They gave notice in a formal letter dated September 1, 2004. Tab C, Dolphins Jt.Ex. 2. The letter outlined the nature of Williams' breaches of his Contract and outlined the

---

[3] The CBA incorporates the standard NFL Player Contract. *Id.*, Art. XIV & App. C.

basis for the relief requested. *Id.* Williams then filed an answer to the grievance. Tab C, Dolphins Jt.Ex. 3.

A hearing was conducted before well-respected Arbitrator Richard Bloch – who was jointly selected by the parties pursuant to the CBA – on September 21, 2004, at which Williams was personally represented by the General Counsel of the NFLPA. Williams Pre-Hearing Brief at 34. The parties submitted the pre-hearing briefs attached hereto, outlining the issues they sought to argue. Specifically, Williams argued that: (1) the Dolphins could not recover money that the Saints paid Williams under the Saints Contract; (2) repayment of the incentive payments provided by the Contract was an improper "penalty" that was inconsistent with the CBA and applicable Florida law; and (3) repayment of any portion of the signing bonus was inconsistent with Louisiana law. Williams Pre-Hearing Brief at, *e.g.*, 1-3.

    3.    <u>Arbitrator Bloch Rules In Favor Of The Dolphins And The Management Council And Orders Williams To Repay $8,616,343.</u>

In the Award and 12-page Opinion, Arbitrator Bloch ruled in favor of the Dolphins and the Management Council, and ordered Williams to pay the Dolphins $8,616,353.00.

The Opinion first outlines each of the parties' contentions. *Id.* at 2. The Opinion then analyzes the contract provisions regarding the signing bonus, holding that the Contract expressly incorporated the Additional Consideration Provision from the Saints Contract. *Id.* at 4-7. Rejecting Williams' argument that the Dolphins had no grounds for recovering the proportionate share of the signing bonus under these provisions, Arbitrator Bloch holds "these provisions are unambiguous as to the repercussions of a breach by the player. . . ." *Id.* at 7. As a result of defaulting, the Opinion states that "Williams is clearly obligated to return $3,316,343.00 of the signing bonus to the Miami Dolphins which, by standard operation of the trade, now stands in the shoes of the assignor New Orleans Club." *Id.*

The Opinion next addresses Williams' Performance Bonus under the Contract. It identifies six specific provisions requiring "immediate return and refund" or "relinquish[ment] and forfeit" of incentives and salary escalators "regardless of the year in which" they were

earned. *Id.* at 7-8. Arbitrator Bloch concludes that "[t]his language is comprehensive and unambiguous" and mandates the repayment of $5,300,000.00. *Id.* at 8.

Arbitrator Bloch then addresses Williams' argument that an order requiring repayment of the bonus and incentives would constitute an impermissible form of liquidated damages and would violate Florida or Louisiana law. *Id.* at 9-12. Arbitrator Bloch rejects these contentions. While he acknowledges the "commonly-accepted principle that a liquidated contract provision must bear some reasonable relationship to the anticipated loss[,]" he holds that "[e]ven were one to embrace a liquidated damages approach," the Dolphins had traded three draft picks to the Saints for Williams. *Id.* at 11. The Opinion, therefore, states "it is not at all clear the stakes would be considered disproportionate." *Id.*

Further, Arbitrator Bloch concludes that the forfeiture provisions were not liquidated damage provisions, but "terms that highlight, with precision, those circumstances in which bonus monies will be given and those in which they will be taken away." *Id.* He then explains:

> Reading the contract as a whole, there is no real question that what was bargained here was a comprehensive incentive and default mechanism. At stake was not solely a series of individual field performance goals and rewards for the player but also a long-term arrangement that figured prominently in the [Dolphins'] overall plan. Under the circumstances, it was not unreasonable for the parties to structure incentives that recognized and accommodated both expectations. These were not simply surrogate methods of estimating damages in the event the bargain went sour; rather, they were the essence of the bargain themselves.

*Id.* The Contract was part of "extensive plans" the Dolphins had for the team and Williams, and attempted to "ensure a long-term relationship" that "was held for naught when Williams walked away." *Id.* at 12.

### E.     Williams Fails To Comply With The Award.

Under the terms of the CBA, Williams had 30 days to pay the money due under the Award. *Id.*, Art. IX, § 12. Williams has failed to do so. Accordingly, the Dolphins and Management Council have filed this action to confirm the Award.

### III. THE COURT SHOULD CONFIRM THE ARBITRATION AWARD.

#### A. Arbitrator Bloch's Award Should Be Confirmed Under Settled Law That Arbitration Awards Must Receive Substantial Deference And Are Subject To Very Limited Judicial Review.

On its face, Arbitrator Bloch's well-reasoned Opinion carefully analyzes the legal and factual issues presented in the grievance. In reaching his conclusions, Arbitrator Bloch interpreted the Contract provisions at issue, considered the facts surrounding Williams' "retirement," and weighed the legal arguments Williams presented. Under the well-settled standard of review, Arbitrator Bloch's decision is entitled to substantial deference and the Award should be confirmed.

The Federal Arbitration Act ("FAA") "imposes a heavy presumption in favor of confirming arbitration awards. As a result, a court's confirmation of an arbitration award is usually routine or summary." *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1288 (11th Cir. 2002) (internal citations omitted); *see also Gianelli Money Purchase Plan and Trust v. ADM Investor Servs., Inc.*, 146 F.3d 1309, 1312 (11th Cir. 1998) ("Judicial review of arbitration awards is 'narrowly limited,' and the FAA presumes that arbitration awards will be confirmed." (citation omitted)). Moreover, where, as here, an arbitration award has been made pursuant to a collectively bargained for grievance procedure, the Supreme Court has held that "[c]ourts are not to usurp those functions which collective bargaining contracts have properly 'entrusted to the arbitration tribunal, . . . but should defer to the tribunal chosen by the parties finally to settle their disputes.'" *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562-63 (1976) (quoting *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 566 (1960)). Thus, where the grievance and appeal procedures set forth in a collective bargaining agreement have been exhausted, the parties are bound by the finality provisions of the agreement "[s]ubject to very limited judicial review." *Del Costello v. Int.'l Brotherhood of Teamsters*, 462 U.S. 151, 164 (1983); *see also Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (judicial review of labor arbitration decision rendered pursuant to collectively bargained settlement agreement "is very limited"); *Int'l Brotherhood of Electrical Workers, Local Union No. 199 v. United Telephone Co.*

*of Florida*, 738 F.2d 1564, 1567 (11th Cir. 1984) ("the scope of judicial review of labor arbitration decisions is 'exceedingly narrow'") (quoting *Loveless v. Eastern Airlines, Inc.*, 681 F.2d 1272, 1275 (11th Cir. 1982)).

Provided that Arbitrator Bloch "arguably constru[ed] the contract and act[ed] within the scope of his authority," this Court must give deference to his decision. *See Major League Baseball Players Ass'n*, 532 U.S. at 509 (if an "arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact a court is convinced he committed serious error does not suffice to overturn his decision") (quoting *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000)); *IBEW, Local No. 199*, 738 F.2d at 1567 (same). If this test is met, "the court cannot overturn his decision simply because it disagrees with his decision." *IBEW, Local No. 199*, 738 F.2d at 1567.

Indeed, even if convinced an arbitrator has erred in interpreting facts or law, a court must still give deference to the arbitrator's decision. "Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement." *Major League Baseball Players Ass'n*, 532 U.S. at 509 (citing *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 36 (1987)); *IBEW, Local No. 199*, 738 F.2d at 1567 ("'It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.'") (quoting *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960)). "An arbitrator's result may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet, it may not be subject to court interference." *Delta Air Lines, Inc. v. Air Lines Pilot Assoc., Int'l*, 861 F.2d 665, 670 (11th Cir. 1988). Indeed, a court may decline to give deference because of a "substantive mistake" only "in rare instances of egregious error, such as when the award is irrational, when it fails to draw its essence from the collective bargaining agreement, or when the arbitrator has exceeded a specific contractual limitation on the scope of his authority." *Wallace v. Civil Aeronautics Board*, 755 F.2d 861, 863 (11th Cir. 1985) (citing *Loveless*, 681 F.2d at 175-76).

The Court must give deference to the Award. Arbitrator Bloch devotes most of the Opinion to analyzing and applying specific provisions in the Contract. While Williams may believe that Arbitrator Bloch's conclusions were in error, there is no basis for suggesting that his conclusions were irrational, that he was not "arguably construing" the Contract, or that the Award does not draw its essence from the Contract. To the contrary, Arbitrator Bloch repeatedly concluded that the Contract provisions were unambiguous and applied them according to their express language.

Nor can Williams contend that Arbitrator Bloch exceeded any authority granted by the CBA. The CBA expressly provides that the arbitrator is empowered to decide "[a]ny dispute . . . involving the interpretation of, application of, or compliance" with the CBA or Player Contract. *Id.*, Art. IX, § 1. Thus, Arbitrator Bloch acted squarely within his authority under the CBA in issuing the Award.

Accordingly, applying well-settled principles of arbitration law, the Court should confirm the Award in its entirety.

### B.   Williams' Affirmative Defenses Have No Merit.

Williams does not contend in his Answer, nor could he, that the Award should be vacated based on any of the statutory grounds for vacating arbitration awards set forth in the FAA.[4] Williams' Answer asserts three, overlapping, non-statutory affirmative defenses to enforcement of the Award: (1) "the arbitrator acted in manifest disregard of the clear and unequivocal laws of Florida and Louisiana"; (2) "enforcement of the Award would violate well-established public policy"; and (3) the Award "is arbitrary and capricious." *Id.* at ¶¶ 20-22. None of these arguments has merit.

---

[4] The FAA lists four statutory grounds for vacating an arbitration award: (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing or in refusing to hear evidence or other prejudicial misbehavior; and (4) where the arbitrators exceeded their powers or imperfectly executed them such that no final award was made. 9 U.S.C. § 10(a). Williams has not contended that any of these grounds exist here.

1.  The Award Does Not Manifestly Disregard The Law.

Williams cannot demonstrate that Arbitrator Bloch manifestly disregarded the law in making the Award. The standard for proving "manifest disregard" is <u>very</u> high: "An arbitration board that incorrectly interprets the law has not manifestly disregarded it. It has simply made a legal mistake. To manifestly disregard the law, one must be conscious of the law and deliberately ignore it." *Montes v. Shearson Lehman Bros., Inc.*, 128 F.3d 1456, 1461 (11th Cir. 1997); *accord Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1223 (11th Cir. 2000).

*Montes* and *Brown* illustrate the difference between erring in applying the law and acting in "manifest disregard" for the law. In *Montes*, the Eleventh Circuit found "manifest disregard" because the arbitration panel recognized that one party had specifically asked the arbitrators to disregard the law, and the award provided no reason to believe that the arbitrators had declined the party's request. 128 F.3d at 1462. By contrast, in *ITT Consumer Fin. Corp.*, the party seeking to vacate the award failed to demonstrate manifest disregard, because the party claimed only that "the arbitrator applied the wrong legal test in assessing his retaliation claim, but [did] not assert that this alleged error was intentional or that the arbitrator made a conscious decision not to follow the appropriate legal standard." 211 F.3d at 1223.

Here, Arbitrator Bloch did not disregard any law. He acknowledged the basic principle of the cases Williams cited stating that a liquidated damages "provision must bear some reasonable relationship to the anticipated loss," Opinion at 10-11, but then concluded that the default and repayment obligations were: (1) not a liquidated damages provision; and (2) even if they were, they were not disproportionate to the harm suffered by the Dolphins, who had traded three draft picks for Williams and made an overall plan for the team in which he played a prominent role. *Id.* at 11. In so ruling, Arbitrator Bloch applied the law, but found that it did not bar the Award. Accordingly, even if Williams contends Arbitrator Bloch erred in applying the applicable legal principles, he did not manifestly disregard them. *E.g.*, *Montes*, 128 F.3d at 1461 (manifest disregard is not shown if arbitrator simply "incorrectly interpret[ed] the law . . . [and] made a legal mistake").

{M2190292;2}

13

### 2. The Award Does Not Violate Any Well-Established Public Policy.

Equally unavailing is any argument that enforcing the Award would violate public policy. At the outset, we should note that the Answer does not identify any particular public policy that Williams alleges has been violated, but the Dolphins and Management Council anticipate that Williams will likely parrot his manifest disregard assertions – that enforcing the Award would violate public policy by imposing liquidated damages. Like the manifest disregard argument, the public policy argument must fail.

"The public policy exception . . . allows courts to refuse to enforce awards where enforcement would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Brown v. Rauscher Pierce Refenses, Inc.*, 994 F.2d 775, 782 (11th Cir. 1993) (internal quotations and citations omitted). "[T]he public policy exception is implicated when enforcement of the award compels one of the parties to take action which <u>directly</u> conflicts with public policy." *Id.* (emphasis added). Where, however, the "public policy argument is no more than a complaint that the [arbitrator] failed to interpret the law correctly[, a court] may not set aside an arbitration award because the [arbitrator] erred in its interpretation of the law." *Id.*

Arbitrator Bloch's Award does not violate public policy. It orders Williams to repay money pursuant to a contract that expressly and unambiguously set forth the terms under which Williams' failure to perform his Contract would mandate repayment. That Florida and Louisiana law disfavor penalties when they bear no relationship to actual harm does not create a public policy that the Award violates. Indeed, as Arbitrator Bloch recognized, the Dolphins gave up substantial amounts in its trade for Williams; his departure on the eve of pre-season training camp stripped the Dolphins of the centerpiece of their long-term plans. Opinion at 11. Thus, Arbitrator Bloch was within the scope of his discretion to conclude that the amount of the Award was not disproportionate to the harm the Dolphins suffered.

Therefore, it is impossible to conclude that the Award violates public policy. Indeed, one could make just as strong an argument that allowing Williams to keep millions of dollars in

bonuses and incentives designed to keep him a happy and productive part of the Dolphins long-term plans would violate public policy. That would be a huge windfall to a player who blatantly disregarded his contractual obligations and abandoned his team and teammates at the worst possible time. Public policy supports the Award; it does not preclude it.

### 3. The Award Is Not Arbitrary And Capricious.

Williams also cannot establish that the Award was arbitrary and capricious. Under Eleventh Circuit law, a decision may not be vacated as arbitrary and capricious "unless no ground for the decision can be inferred from the facts." *ITT Consumer Fin. Corp.*, 211 F.3d at 1223. The Eleventh Circuit has explained this can occur only in two circumstances: "First, . . . when the award exhibits a wholesale departure from the law. . . . Second, . . . when the award is not grounded in the contract which provides for the arbitration." *Rauscher Pierce Refenses*, 994 F.2d at 781. However, "[f]or an award to be vacated as arbitrary and capricious, the [arbitrator's] award must contain more than an error of law or interpretation . . . . Rather, there must be no ground for the [arbitrator's] decision." *Id.*

This is not the case here. Arbitrator Bloch's Opinion consists of 12 well-reasoned pages discussing the express language of the Contract, prior arbitration decisions, and liquidated damages law, and ultimately concludes – in accordance with well-established NFL arbitration precedent – that the Contract, precedent, and applicable law justify the order of repayment. The Opinion plainly sets forth the grounds for Arbitrator Bloch's Award. Accordingly the Award is not arbitrary and capricious. Therefore, this affirmative defense must fail as well.

## IV. CONCLUSION

For the reasons set forth above, the Dolphins and the Management Council respectfully request that their Motion for Confirmation of Arbitration Award be granted, that the Award be confirmed, and that the Court award the Dolphins and the Management Counsel such other and further relief as the Court deems proper.

Date: December 17, 2004                    Respectfully submitted,

**AKERMAN SENTERFITT**
One Southeast Third Avenue
28th Floor
Miami, FL 33131-1714
Telephone No. (305) 374-5600
Facsimile No. (305) 374-5095

By _____
STANLEY H. WAKSHLAG
Florida Bar No. 266264
E-mail: stanley.wakshlag@akerman.com
CHRISTOPHER S. CARVER
Florida Bar No. 993580
E-mail: christopher.carver@akerman.com

*Counsel for Miami Dolphins, Ltd.*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
Telephone No. (202) 887-4067
Facsimile No. (202) 955-7791

By _____
DANIEL L. NASH
E-mail: dnash@akingump.com
*Pro Hac Vice*
REX S. HEINKE
JESSICA M. WEISEL

*Counsel for National Football League Management Council*

{M2190292;2}

*Miami Dolphins, Ltd. v. Williams*
Case No. 04-61422-CIV-COHN/SNOW

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of the *Motion of Petitioners Miami Dolphins and National Football League Management Council for Confirmation of Arbitration Award, and Supporting Memorandum of Law* were served by U.S. mail this 17th day of December, 2004, on:

Edward Soto, Esq.
**WEIL GOTSHAL & MANGES LLP**
1395 Brickell Avenue
Suite 1200
Miami, Florida 33131

Jeffrey L. Kessler, Esq.
David G. Feher, Esq.
Melanie, Moss, Esq.
**DEWEY BALLANTINE LLP**
1301 Avenue of the Americas
New York, New York 10019

Richard A. Berthelsen, Esq.
General Counsel
National Football League Players
Association, Inc.
2021 L Street, N.W.
Washington, D.C. 20026

_____
Attorney

# UNITED STATE DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

ATTACHMENT TO DOCKET ENTRY:     15

# NOT SCANNED

- ☐ VOLUMINOUS (exceeds 999 pages = 4 inches)
- ☐ BOUND EXTRADITION PAPERS
- ☐ ADMINISTRATIVE RECORD (Social Security)
- ☐ STATE COURT RECORD (HABEAS CASES)
- ☐ SOUTHERN DISTRICT TRANSCRIPTS
- ☐ LEGAL SIZE
- ☐ DOUBLE SIDED
- ☐ PHOTOGRAPHS
- ☒ POOR QUALITY (i.e. hand written, legal size, light print, etc.)

# PLEASE REFER TO COURT FILE